[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Dr. Gottlob was hired by Connecticut State University to set up and direct an academic center. The center was to provide help for students with academic problems; it provided tutoring services and counselling and its primary purposes was to aid student athletes in their course work.
Dr. Gottlob reported to university officials that on or about December 2, 1991 one of her assistants found a notebook at the center which might indicate one or more students were involved in gambling on professional sports. The assistant said the notebook appeared to contain nicknames and dollar amounts bet on games; it also appeared to belong to a student athlete on the football team. Dr. Gottlob told officials she no longer had the notebook. It was apparently returned to the student by someone, not Dr. Gottlob, at the center.
She also told university officials at the same time that prior to the discovery of the notebook a student from the football team had approached her and told her about a personal gambling problem that he had and she referred him for special counselling.
The university has an extensive athletic program in which many students are involved. It is important that it be in full compliance with NCAA regulations in order that its participation in that organization be maintained and so that the integrity of the athletic programs be guaranteed. In fact one of the very purposes for the setting up of the academic center was to ensure that NCAA CT Page 815 rules and regulations be complied with as to academic requirements. NCAA regulations require that student athletes should comport themselves with honor and dignity. It is a violation of NCAA rules if gambling activity goes on regarding college sports and it is a violation of NCAA rules to refuse to furnish information concerning possible violation of NCAA regulations when requested. Apparently those regulations require an immediate investigation into alleged gambling activity — failure to do so could result in the loss of the school's ability to compete in NCAA games.
The general importance of compliance with these regulations is obvious; for many students an important part of their college experience depends on their ability to participate in and compete in athletic events. The school, its administration and faculty save an important responsibility to make sure that NCAA regulations are complied with.
The danger to particular students involved in gambling activities surrounding athletic events should even be clearer. Widespread activity of this sort would compromise the integrity of athletic competition and thus destroy its enjoyment for students participating in these programs. A major concern is also the possibility that students engaging in such activity would be participating in crime that in certain circumstances could endanger their educational career and, depending on the elements they were involved with, even their safety. The morally corrupting influence on 18 and 19 year olds of such conduct should be a concern to all school officials charged with their welfare.
Dr. Beyard was the plaintiff's immediate supervisor. She requested that Dr. Gottlob reveal the name of the student to police authorities. Dr. Gottlob refused. She claimed that an important part of her function was to counsel students. It was of the utmost importance that students could talk to her in confidence. The student involved asked for confidentiality and Dr. Gottlob said she would honor that request. Dr. Gottlob got the student involved in counselling. Dr. Beyard insisted, however, that Dr. Gottlob must reveal the student's name. Dr. Gottlob requested time to speak to lawyer regarding this matter which Dr. Beyard gave her. The lawyer told her she should cooperate with the police but that she was not obligated to reveal the student's name. Dr. Beyard sent the plaintiff a memo indicating she should talk to the university chief of police. She met with the chief. It should be noted that the plaintiff's briefs appear to suggest, at least at one point, that Dr. Gottlob was prepared to divulge the name at this meeting CT Page 816 but the chief said it would no longer be necessary because so much time had elapsed. Approximately one or two weeks elapsed from the time the information was requested until the chief said it was no longer necessary.
I do not agree with the characterization of Dr. Gottlob's testimony made in plaintiff's briefs. I believe Dr. Gottlob testified she only told the chief that she would try to encourage the student to come forward, she said this on direct and cross. On direct she explained to the chief her discomfort over the confidentiality issue and said she'd try to work with him.
Chief Powell also testified. He expressed his concern with gambling activities and said if organized crime figures were involved a concern would be how far people would go to collect their debt. The Chief corroborated Dr. Gottlob's testimony that at their meeting he did not request the name of the student who came for counselling on his gambling problem. He said too much time had passed and without the notebook the student's individual name wouldn't be of interest to him. There was nothing, in the chief's testimony to indicate that Dr. Gottlob told him that she was prepared to reveal the name if necessary. In an earlier conversation he had by phone with the plaintiff she indicated that based on her notions of confidentiality she would have to refuse to reveal the name even if, as he said, it would have been a violation of law. That Dr. Gottlob was not prepared to reveal the name and thought as a matter of principle the name of the student coming for counselling over a matter such as gambling shouldn't be revealed is consistent with her testimony as to when she felt a student's name should be disclosed to authorities. She reserved to herself the right to determine the ambit of confidentiality and said there are limits to confidentiality — she would not feel bound to confidentiality if a life threatening situation presented itself, if someone was in physical danger were the examples she gave.
Dr. Gottlob is a highly principled individual of great integrity. She had complete devotion to what she felt were the interests of the students. It would be inconsistent with her character as well as the testimony presented to conclude that she would be prepared to reveal a student's name under the circumstances existing in this case.
The court will discuss further findings as to the facts as it becomes necessary during the course of the opinion. CT Page 817
 I.
The plaintiff bases her action on § 31-51q of the General Statutes. That statute provides that an employer is liable for the discipline and discharge of an employee on account of the employee's exercise of certain constitutional rights including thefirst amendment to the federal constitution.[1] The parties have imported the 42 U.S.C. § 1983 analysis of cases involving discharge for alleged exercise of First Amendment rights into their analysis of how § 31-51q should apply. This certainly seems appropriate although our statutory language granting a cause of action only where the allegedly protected activity is found not to "substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employee" reads somewhat differently from federal case law which as will be discussed also limits the right of recovery on First Amendment § 1983 claims. In any event at this point I will adopt the federal § 1983 analysis for a First Amendment
claim under our statute — our statute explicitly refers toFirst Amendment rights so this seems to be the only course of action to take. Before addressing the merits the court will address two preliminary matters. First the court will discuss the elements that must be proved in this type of action, some of the defenses, and which party has the burden of proof.
(a)
The federal cases talk in terms of a "public employer", "public employee" relationship. In this latter context a case likeFrazier v. King, 873 F.2d 820, 825 (CA 5, 1989) makes the following remarks which are applicable here:
 "In order to establish a constitutional violation Frazier must first prove that her speech involved a matter of public concern. . . . Second she must demonstrate that her interest in `commenting upon matters of public concern' is greater than the defendant's interest in `promoting the efficiency of the public services (they) perform. Third she must show that her speech motivated the defendant's decision to fire her."
Also see White Plains Touring Corp. v. Patterson, 991 F.2d 1049,1057 (CA 2, 1993), Giarcalone v. Abrams, 850 F.2d 79, 86-87 (CA 2, CT Page 818 1988), Brauner v. City of Richardson, 855 F.2d 187, 191 (CA 5, 1988), Connick v. Myers, 461 U.S. 138, 140, 151 (1983), Annotation at 97 L.Ed.2d 903 (1987), see article at 22 PO F.2d 203 (1993).
The Frazier court sets forth the elements for aFirst Amendment cause of action by an employee. It may be incorrect in its burden of proof allocation, however. In White Plains Towing
the court indicated the employee must establish as a threshold matter that his or her speech raised matters of public concern and that the speech was a substantial or motivating factor in the discharge or, here, failure to renew the employee's contract. Then the court goes on to say the employer can escape liability in either of two ways (1) if it establishes it would have made the same employment decision even in the absence of protected conduct (2) even if this is not established the employer can prevail if the employee's conduct interfered with the employer's effective and efficient fulfillment of its responsibilities toward the public,991 F.2d at 1058-1059. Rankin v. McPherson, 483 U.S. 378, 388
(1987) explicitly places on the State, where it is the defendant, the burden of "justifying the discharge on legitimate grounds. Even under a statute like ours which provides a remedy against private employers this would seem a reasonable allocation of burdens since the employer would have access to facts and would be better able to argue a position that tried to show the employee's speech interfered with its efficient operation. Also the defendant here is not the state qua state but it is a government financed institution operating under state regulations and it is part of the state educational system. The court concludes a plaintiff must first establish the speech raised matters of public concern but a defendant must then show by a preponderance of the evidence that the failure to renew the plaintiff's contract was justified by a legitimate concern raised by the speech. However, before turning to the merits the court will discuss one other preliminary matter.
(b)
The parties have extensively briefed the issue of res judicata and collateral estoppel. Both principles prevent a party from relitigating an issue that has been determined in a prior suit,Gionfriddo v. Gartenhaus Cafe, 15 Conn. App. 392, 402 (1988). The plaintiff initially brought suit on a First Amendment claim in Federal District Court and Judge Covello dismissed the matter on the face of the complaint stating the plaintiff did not state a valid First Amendment claim. Judge Covello was dealing with the allegations of a complaint; a full trial on the facts has been held CT Page 819 in front of me. In this case, the defendant raised this defense as a special defense. The plaintiff in a reply brief indicates that in federal court she didn't have the opportunity to litigate her present claim that she cooperated with university authorities. That seems odd in light of the allegations of a paragraph 23 of the complaint filed in federal court where the plaintiff alleges cooperation. I fail to see how the nature of her cooperation brought out at trial here differs from what she alleged in the federal complaint.
But here we have the situation where a complaint has been dismissed in federal court on the basis of purely legal arguments over the allegations of the complaint. Given the balancing of competing interest demanded in First Amendment cases, and since here even though § 31-51q is the basis for the suit a state entity is involved, how can I conclude or why should I have to examine every nuance of the facts as brought out at this trial to see if they can be matched up with the language of some federal complaint. Besides the doctrines were created to "conserve the time of the court and prevent wasteful relitigation", Id page 401. I've already had the trial; I don't believe any advantage to me in having to write a shorter opinion should prevent the plaintiff from receiving a decision on the merits which she can appeal if she so chooses. Therefore out of an excess of caution I will write a decision on the merits.
(c)
The court will now discuss the merits of this case. Did the speech that occurred here involve a matter of public concern? Each side in this case assumes that the answer to this question is clear cut but then come to dramatically opposed conclusions on the issue. The cases say a decision on this matter is a question of law to be decided by the court, Giarcalone v. Abrams, supra,850 F.2d at p. 86, Caron v. Silvia, 588 N.E.2d 711, 714 (Mass, 1992), cfPennekamp v. Florida, 328 U.S. 331, 335
(1946). However, the guidelines established by the federal courts are so general that they give little guidance in a particular case. The decisions give a broad or narrow interpretation of what may be a matter of public concern, see cases collected in Caron v. Silvia, id. at p. 714. One commentator has described the definition of this term as a "murky area", 22 P.O. F 3d at p. 227. In Connick v. Myers, at 461 U.S. page 147 the court said: "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." CT Page 820 It has been said that "content is the greatest single factor in theConnick inquiry" Berg v. Hunter,
854, F.2d 238, [854 F.2d 238], 243 (CA 7, 1988).
In other words the form in which the employee expresses herself can be significant in the sense that appearances on television, letters to the editor, radio interviews, circulation of petitions make it more unlikely that the employee in making utterances was doing so on matters related exclusively to personal grievances, Caron v. Silvia, supra 588 N.E.2d at p. 715 (national television appearances) Brauner v. City of Richardson, 855 F.2d 187,191 (CA 5, 1988) (court noted complaint letter sent to city council members and reporters). However, the cases will extendFirst Amendment protection to employee communications whose content is clearly one of public concern but where the employee only communicated the matter to superiors or in an office or work place setting, Giarcalone v. Abrams, 850 F.2d at p. 83, 86, Churchill v.Waters, 977 F.2d 1114, 1118 (CA 7, 1992), rev'd. on other grounds128 L.Ed 686 (1994) (break room conversation by plaintiff nurse with a trainee), Gihvan v. Western Line Consolidated SchoolDistrict, 439 U.S. 410 (1978) where in speaking of First Amendment
rights the court said at pp. 415-416: "Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his (sic) employer rather than to spread his (sic) views before the public.", also see Connick v. Myers, 461 U.S. at p. 141 (memo submitted by plaintiff to fellow attorneys in District Attorney's office).
Thus in Gihvan the employee spoke out as a citizen complaining about what she perceived as racially discriminatory hiring practices in the school where she worked. The court reasoned that the plaintiff's right to protest racial discrimination clearly a matter of inherent public concern — wasn't forfeited by her choice of a private forum to air her complaints, see footnote at p. 148 ofConnick v. Myers commenting on Gihvan.
Here, then, the fact that Dr. Gottlob didn't give her concerns a more public airing — contact with media or non-university officials — does not preclude a court from finding that her statements were a matter of public concern. In this case the content of the statements and the context in which they were made is more determinative of this issue. The content of Dr. Gottlob's communications to Dr. Beyard and Chief Powell revolved around the issue of confidentiality. Dr. Gottlob informed these individuals that a notebook had been found at the student center she ran containing what might be gambling notations and that a student CT Page 821 athlete came to her for counselling and revealed he had a gambling problem. However, she refused to reveal the identity of the student because she felt that this would violate his request for confidentiality. Dr. Gottlob believed that request had to be honored because, if it was not, her ability to perform her job at the student center would be seriously compromised. Although the center was set up to help students with academic problems it is obvious that such problems often arise because youngsters are having serious personal problems related to school and non-school activities. If students couldn't be assured that what they said in counselling sessions at the center were kept confidential then they would not seek counselling in situations where they need it and where failure to get such counselling might seriously affect their ability to perform well academically and as participants in even non-academic college activities.
First it should be said that Dr. Gottlob in her testimony and through the testimony she presented and even that presented by the defendant impressed the court as a person of great integrity. The very way in which she communicated the information she had underlines that. She did not hide what she knew to protect herself or even the position she had arrived at. Neither does the court find that she acted out of narrow personal financial or job condition or job security interests. She acted on the basis of what she felt was a commitment she made to an individual student and on what she felt was in the best interests of a proper running of her student center. The student center performed an important role in the university's life and the devotion this individual had to accomplishing its goals was well established by the testimony, not the least of which being the enormous amount of hours she put into her work.
All of this having been said, however, doesn't mean that the communications Dr. Gottlob made were a matter of public concern. The plaintiff quite forcefully argues in one of its briefs that it defies logic and common sense to conclude that an issue of public concern wasn't involved here — Dr. Gottlob was trying to protect the confidentiality interests of a student not advance her own personal interests. But such an argument merely sets forth a conclusion as to the propriety of finding a public concern here rather than providing a reason.
From reading the cases there are four broad categories of fact patterns. One type of case involves situations where an employee is dissatisfied with an employer's decision concerning his or her CT Page 822 job condition or placement. The employee then makes complaints or sends memos to fellow workers complaining about the employer's actions and might even embellish the complaint by saying for example that the morale at the office was poor and job supervisors were incompetent. Courts have had no problem with finding that communications on such matters do not raise issues of public concern. The employee is basically raising dissatisfaction with the way he or she has been or is about to be treated, Connick v.Myers, 461 U.S. at p. 148. The court at footnote 8, page 148, went on to note that although issues of office morale and discipline could be matters of public concern "in different circumstances", this is "beside the point" since the trial court's task is to determine whether the context of the communication made in the case before it really was based on the individual employee's personal interest. As was said in Brown v. City of Trenton, 867 F.2d 318,322-23 (CA 6, 1989) concerning the task of determining whether a public interest is involved:
 As thus baldly phrased the question is a difficult one (or perhaps an excessively easy one) to answer — for it is hard to see how any aspect of the operation of any department of any public body could be said not to constitute a legitimate subject of public concern. Connick instructs us to examine both the content and the context of the employee's statement, however, and the court's opinion seems to suggest that if, having done so we find the employee's personal interest qua employee predominates or any interest he (sic) might have as a member of the general public, we are not to intercede.
Another category of cases involves those employee statements that Connick seems to regard as going to the heart of theFirst Amendment interest sought to be advanced. Thus at 461 U.S. page 148Connick the employee was a district attorney and the court found many of her complaints were not of public concern; but the court made clear that a matter of public concern would be raised if the employee sought to inform the public that the district attorney's office was not discharging its public duties in prosecuting criminals, or where there were instances of breach of public trust or wrong doing involved. If such allegations are made the courts have been quick to find the employee statements and allegations raised issues of public concern, Piesco v. City of New York,
CT Page 823933 F.2d 1149, 1157 (CA 2, 1991) (criticism of entrance exams as leading to hiring of incompetent police), Matulin v. Village ofLodi, 862 F.2d 609, 612 (CA 6, 1988) (accusation that university officials engaged in unlawful discrimination), Roth v. Veteran'sAdministration, 856 F.2d 1401, 1406 (CA 9, 1988), Frazier v. King,873 F.2d 820, 825 (CA 5, 1989), Brauner v. City of Richardson,855 F.2d 187, 192 (CA 5, 1988) (accusations of wastefulness or gross mismanagement).
A third type of case involves perhaps a situation where the employee responds to limitations put on his or her job conditions but the public itself by recent public debate over the issue or legislation enacted to cover the matter has itself defined the matter as one of public concern. Thus there is the interesting case of Caron v. Silvia, 588 N.E.2d 711, 714 (Mass, 1992) where an employee spoke out an alleged interference with her rights as a smoker. The court noted, in finding the matter one of public concern, that the issue had been one of considerable public debate and state legislation.
This case appears to be a special category to itself. The employee plaintiff does not speak out for her own selfish or immediate personal interests. However, although her position is framed in the guise of protecting the confidentiality rights of a student it can be said that what is really involved here is a dispute over the internal operations of the university when it confronts an issue of student confidentiality. Should senior university officials decide whether confidentiality should be extended to student communications involving possible criminal activity or should individual faculty or university employees entrusted with a counselling role make that determinate? If there is to be confidentiality should it only apply to non-university parties but not operate as to prevent disclosure to university officials or university police investigators? From one perspective what transpired here is purely a matter of internal university policy over spheres of authority. Dr. Gottlob headed a student center which did counselling. She honestly believed the effective accomplishment of the goals of the center — improving academic performance and adjustment to university life — required confidentiality as to student disclosures made to her. A university official disagreed with her based on what she perceived as broader university interest — compliance with regulations which would determine school participation in athletic events and ensuring that students didn't become involved in criminal activity. Are such questions matters of public concern? Dr. Gottlob made a CT Page 824 personal commitment of confidentiality to a student. She would have had to break that commitment if she disclosed his name. Certainly a principled person like Dr. Gottlob would have been deeply upset if she had to break her promise to this individual student. But that hardly makes the issue now before the court and the communications Dr. Gottlob made relative to this matter ones of public concern. As Connick said the communication must be examined in the context and under the circumstances in which it was made.
Dr. Gottlob's concern beyond the fact that she made a personal commitment to this student, in fact her major concern, was that failure to grant counsellors like her the right to determine the ambit of confidentiality would mean that students wouldn't be open in disclosing problems that caused them academic difficulties.
But even she put some limits on the right of a student to expect confidentiality. She indicated that she would disclose information where a person's physical safety was threatened. Can the courts safely intervene in this area or do they even have the competency to resolve these issues that arise in an academic setting.
A Fourth Circuit case, Daniels v. Quinn, 801 F.2d 687 (CA 4, 1986) makes an interesting comment. There a teacher complained to a public official that she hadn't received materials for a remedial reading course. She claimed the decision not to rehire her was made because of these comments and this violated herFirst Amendment rights. The court recognized that the threshold question was to determine if the plaintiff's remarks were about a matter of public concern. The court at page 690 said the following:
 She contends, however, that the late arrival of remedial reading materials is a matter of public concern because it affects her ability, and that of others, to teach. The identical point can be made about innumerable conditions at a school, including, for example, the number of teacher aides, the tightness of class scheduling, the size of black boards, or the adequacy of laboratory equipment. Questions of this sort do not belong in federal court. They are best resolved by local school boards and individual school administrators. To accord to all such grievances the status of protected speech is CT Page 825 to invite a measure of educational involvement that federal tribunals are ill equipped to undertake.
This is a close case and a difficult one but I would have to day that the matter does not raise an issue of public concern.
(d)
The court will consider all the issues raised in this case despite its ruling on whether the matter is one of public concern.
If the plaintiff had established that the matter she raised was one of public concern the court would still have to consider whether "her interest in `commenting upon matters of public concern' was greater than the defendants' interest in `promoting the efficiency of the public services (they) perform'", Frazier v.King, 873 F.2d 800, 825 (CA 5, 1989) White Plains Touring Corp. v.Patterson, 991 F.2d 1049, 1058-59 (1993) (see previous discussion allocation as burdens of proof.) The language of Rankin v.McPherson, 483 U.S. 378, 388 (1987) sets forth the pertinent considerations.
The court said that:
 . . . statements will not be considered in a vacuum; the manner, time and place of (the employee's) expression are relevant, as is the context in which the dispute arose. . . . pertinent considerations are whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence and necessary, or impeded the performance of the speaker's duties or interferes with the regular operation of the enterprise.
I believe the dispute in this matter should be set in context in order for the court to address this issue. It won't do to parcel out the issue of the notebook from the refusal to disclose the student's name. Both occurred close in time and both incidents considered together presented to the administration a serious concern that student athletes were involved in gambling activities. The notebook contained notations concerning gambling activities. CT Page 826 A student came to the center seeking counselling because of such activities. The court won't repeat the danger such a matter presents to the life of the university, its continued involvement in athletic activity and the welfare and perhaps even physical safety of students.
University officials when they heard of these matters met, regarded the issue at one of great seriousness and determined that Dr. Gottlob should be contacted. Dr. Beyard and Chief Powell asked Dr. Gottlob for the notebook and that the name of the student who came for counselling be revealed to police authorities at the university. The notebook was apparently already turned back by another person at the student center and Dr. Gottlob refused to reveal the student's name claiming she had an obligation to protect the student's confidentiality. Dr. Gottlob was very open and honest about her position; she did not assert it in an unpleasant or abrasive way. She asked to speak to a lawyer. Up to two weeks passed and she was then directed to go to a meeting with the Chief. At least one the court's view of the record it doesn't entirely ring true for the plaintiff to now say she cooperated fully with university authorities. It is true that at her last meeting with the Chief he did not ask her for the name of the student but he did not do so since in his opinion too much time had passed and the notebook had been returned. As the court previously noted there is no reason to think that Dr. Gottlob would have revealed the name if asked or would ever consider doing so in the future if a similar situation were to arise.
Some cases have held that in order to tip the balance in favor of the employer the employer must show an actual disruption of the services rendered by the defendant or its day to day operations,Melton v. City of Oklahoma, 879 F.2d 706, 715-16 (CA 10, 1989) butConnick makes no such requirement and in fact seems to indicate an honest apprehension of such disruption is sufficient,461 U.S. at pp. 151-52. In any event given the firm stance taken by Dr. Gottlob over the course of this matter, her failure to reveal the name despite being told to and every indication that she would act similarly in the future if the same problem arose, it is difficult to conclude how her stance would not have caused divisive relations regarding this incident and any like future incident. In fact in a phone conversation with Chief Powell he told her that by not revealing the name she might be violating the law and subjecting herself to prosecution. At her actual meeting with Powell her suggestion was that she would contact the student and try to get him to come forward. Given her position of not having to reveal CT Page 827 the name without the student's consent, he would have realized that there was a diversion of opinion as to university policy on a very important matter. The reverberations on community life that this would have caused don't have to be exaggerated to be appreciated.
Another point should be mentioned although it is not meant as personal criticism of the plaintiff. She acted out of the best of motives but her activity during the period when the matter was open did amount to insubordination. Since she would have been head of the student center in the future if her contract had been renewed, it is difficult to see how it could be said that her speech in the context in which it was made and given its content, wouldn't have disrupted working relationships between herself and her immediate assistants on the one hand and supervising university officials and police and investigatory authorities on the other hand.
It is also true that even if the court was incorrect in its conclusion about whether this matter was one of public concern, a stronger showing of disruption or the possibility of disruption must be made by the employer . . . if the employee's speech more substantially involved matters of public concern", Connick v.Myers, 461 U.S. at 152, Frazier v. King, 873 F.2d at p. 826, Mathernev. Wilson, 851 F.2d 752, 761 (CA 5, 1988). Here, however, we do not have as in Frazier, allegations of unethical or corrupt activity where disruption of the ordinary operations of such an employer might even be a positive value, cf Porter v. Califano,592 F.2d 770, 773-74 (CA 5, 1979). We have rather a claim made by a person with no recognized common law or statutory right to assert a claim of confidentiality refusing to disclose the name of a student involved in gambling activities although told to do so by university officials.
Even if raising this matter were held to be a matter of public concern, the court finds that the plaintiff's interest in commenting on these matters is outweighed by the university's interest in efficiently operating its student center in light of all the obligations the university has to the student body in general.
The plaintiff does make the interesting point that the defendant's argument that the plaintiff's speech even if otherwise protected wasn't the proximate cause of the failure to renew her contract and that the university would've come to the same decision anyway would seem to belie any claim that the plaintiff's speech CT Page 828 disrupted or even had the potential to disrupt the activities and/or operations of the university and the functioning of the student center within the university community. Admittedly the defendant's argument does get strained at points and seems disconnected on this issue but the defendant raised them in its brief and through evidence and cross examination so I'm not precluded from considering its position on this balancing argument.
(e)
The questions on which I decided against the plaintiff and which will preclude my rendering judgment in her favor are to me close ones. Given the possibility that if this matter is appealed I could be found in error, I will address other elements in this case which would have had to have been found in order for the plaintiff to have prevailed.
In a First Amendment § 1983 action and in an action under our statute if the plaintiff establishes she engaged in speech which raised matters of public concern and if it is further established that the speech cannot be said to have interfered with the efficient operation of the employer business or activity, in order to recover a plaintiff must still prove another element by a preponderance of the evidence.
A plaintiff must establish that his or her speech was protected and that the speech "was a `substantial factor' — or to put it in other words, that it was a motivating factor in the (employer's) decision not to rehire him" or her Mt. Healthy CityBoard of Education v. Doyle, 429 U.S. 274, 287 (1977).
One commentator referring to Mt. Healthy says that: "Even if an employee shows that a disclosure is protected, he still must demonstrate that the disciplinary action was taken in retaliation for the protected disclosure," Vaughn, Civil Service Discipline andApplication of the Civil Service Reform Act of 1978,
1982 Utah L. Rev. 339, 361. The language of the case does not necessarily require a "but for" standard. One commentator has said the following in discussing the language in Mt. Healthy:
 This does not require proof to the `but for' standard and the retaliation need not be the only factor in the wrongful discharge or demotion. The conjunction `or' may be crucial — (substantial or motivating factor.) The CT Page 829 burden of proof is sustained if the plaintiff demonstrates that the retaliation was a substantial factor in the employer's decision or was a motivating factor; it should not be read as requiring proof that the retaliation was a substantial and motivating factor. The distinction is subtle but significant "Termination or Demotion of A public Employee in Retaliation for Speaking out as a Violation of Free Speech, McKee, 22 PO F.3d 203, 234 (1993).
 Gihvan v. Western Line Consolidated School District,439 U.S. 410, 417 (1979) does use "but for" language but in a broader context. That is it is true that even if the plaintiff employee was discharged or not rehired for protected speech and even if the plaintiff's speech was the primary reason for her not being rehired the trial court must find that the employee would have been rehired but for the protected speech where the defendant raises this defense. Analytically speaking these two considerations are not the same thing despite the observations of the court in Furgensenv. Fairfax County, VA, 745 F.2d 868, 878 (CA 4, 1984).
Was the speech here, if it should be considered protected and could not be regarded as interfering with the efficient operation of the university, a substantial or motivating factor in causing the university not to renew Dr. Gottlob's contract?
Dr. Shumaker, the university president, received Dr. Beyard's recommendation that the plaintiff's contract not be renewed on December 21, 1991. By a letter dated December 27, 1991 he informed the plaintiff that her contract would not be renewed for the 1993-94 calendar year. Dr. Shumaker had the ultimate responsibility of deciding whether the contract would be renewed. He did have conversations with Dr. Enck, the Athletic Director, Judith Davidson, and Dr. Gararea concerning Dr. Gottlob's performance but he candidly admitted that he did not know what action he would have taken if Dr. Beyard had recommended renewal of Dr. Gottlob's contract. The reason for and the motivation behind Dr. Beyard's recommendation to Dr. Shumaker are critical then to determining whether the position Dr. Gottlob took regarding confidentiality was a substantial factor in Dr. Beyard's recommendation.
It is difficult to penetrate people's minds and their intentions. Often the motives people act by are not clear even to CT Page 830 themselves. Some things that occurred in this case do cause the court some concern with the defendant's position that the plaintiff's stance (a) was not a substantial factor in causing non-renewal of her contract and (b) even if it was, the university wouldn't have renewed her contract anyway.
At trial the defendant tried to develop the theme that Dr. Gottlob was a difficult person on occasion who found it hard to get along with coaches and divided students into "good guys" and "bad guys". Dr. Beyard to a large extent relied on hearsay communications from others to reach the just mentioned negative conclusion about the plaintiff and her work. Such reliance on hearsay, in and of itself, is not inappropriate even in aFirst Amendment context, cf Waters v. Churchill 128 L.Ed.2d 686, 700-01
(1994); it is difficult to see how business or school management can arrive at decisions without reliance on evidence that might not be admissible in a court of law.
However, in determining actual motive and whether reasons given for actions taken are pretextural certainly the strength of the information and its inherent persuasiveness can be examined.
Dr. Shumaker and Beyard talked to Dr. Enck. But Dr. Enck by his own admission started "weaning" himself away from the athletic department and its concerns in 1987. One of the coaches who he said had a negative view of Dr. Gottlob joined in a November 15, 1991 letter from the Athletic Department Evaluation Committee that unanimously recommended her contract be renewed. Another coach he mentioned was described by a former student captain of his team as developing a good, social working relationship with Dr. Gottlob after at first resisting some demands of the student center. One coach apparently continued to have problems but he had problems with others and Dr. Gottlob tried in any event accommodate some of his demands. Dr. Enck mentioned one student who had a problem with Dr. Gottlob; one student among hundreds.
What the court found peculiarly unconvincing was Dr. Beyard's testimony as to why she never told Dr. Gottlob about the complaints she received concerning her interaction with the coaches of various teams and her alleged negative attitudes toward some of the students. Dr. Beyard explained this by saying she wanted Dr. Gottlob to start off on a fresh basis with her, not on a negative note, and wanted to give her a chance to work these problems out. Given Dr. Beyard's supervisory role it is difficult to understand why an administrator would have held back such information for CT Page 831 months, information that was so crucial to the efficient operation of the student center. Also if fairness was the consideration is it fair to hold back the information so the employee doesn't have a chance to mend her ways then use the contents of the information to fire her?
If these matters were of concern to Dr. Beyard and quite long standing according to Encks why was the December 1st contract renewal recommendation deadline allowed to pass without an evaluation submitted by Dr. Beyard to Dr. Shumaker. The significant intervening fact was that on December 2 the gambling and student confidentiality issue was brought to the attention of the assistant Athletic Director by Dr. Gottlob.
Also the defendant has persuaded me that the stance Dr. Gottlob took on these matters interfered with the efficient operation of the university. I may be right or wrong on that question. But I certainly won't permit the defendant to have it both ways on that issue nor would it of course be proper for me to insulate my decision from appellate review by an adverse factual finding against the plaintiff on this question. That is, the defendant can't adopt the posture that certain speech of or a stance taken by Dr. Gottlob presented a real danger to efficient university operations but then attempt to say that subject of course had no effect whatsoever on a decision to renew her contract made no more than two weeks later.
When Dr. Gottlob brought her information to the attention of university officials the Executive Council discussed it. The university's status with the NCAA could have been jeopardized by the manner in which the information was responded to by officials. It was regarded as a matter of the utmost seriousness. Dr. Beyard saw fit to write Dr. Gottlob two memorandums and urged her to reveal information Dr. Gottlob refused to disclose. The university police chief indicated Dr. Gottlob could be subjecting herself to criminal prosecution. Both Beyard and the chief worried about gambling not only from the perspective of compliance with NCAA regulations but perhaps even more importantly (and rightfully so) from the perspective of student involvement with criminal activity that could be dangerous to them. Dr. Gottlob's stance on this matter was of great importance to the university.
That is was a substantial factor in Dr. Beyard's recommendation is, for the court, indicated by the very language of Dr. Beyard's recommendation against renewal because of two "serious CT Page 832 weaknesses". Dr. Gottlob was alleged to have weaknesses in two areas (1) understanding of and demonstrated commitment to the university and (2) ability to work corroboratively with people whose views (rightly or wrongly) are different from hers." I have expressed some concerns with finding number (2) already. Dr. Encks made some general reference to complaints along these lines but specific evidence was not offered to show that any project or goal of the work center was not accomplished because of Dr. Gottlob's inability to work corroboratively with others. Dr. Beyard referred to general observations she made. But at least it could be said there is some evidence in the record to support at least some concern with this allegation.
As to finding number (1) — lack of commitment to the university — it is difficult to understand what this could be based upon. The testimony was uncontroverted that this plaintiff worked an inordinate amount of hours during the week and on weekends. She attended student athletic events and made herself completely available to students needing academic help. She seems to have created the student center and the guidelines it should operate under out of whole cloth with extremely limited resources. Former students testified on her behalf, a former coach also testified for Dr. Gottlob; they all supported her position that she worked very hard to accomplish the goals of the student center. How this individual could be said to lack commitment to the university escapes me and doesn't appear to be based on any evidence in the record. In fact I think it reflects the fact that there was a great deal of upset with the stance she took on the gambling and confidentiality issue.
What I believe the evidence establishes here is that we had an individual who was creative and hardworking at her job. She was devoted to the students and had strong views on issues involving her job. There was some evidence that she had disagreements with some university staff particularly one coach. Dr. Enck communicated to Dr. Beyard hearsay information about complaints he received concerning Dr. Gottlob's ability to work with others, that she was not helpful. No detail was provided as to when the complaints occurred who made them or how they might be related to Dr. Gottlob's personality as opposed to lack of resources committed to they student center. However, taken the complaints and information at face value and even crediting that some of these observations were corroborated by Dr. Beyard's observations and conversations with Dr. Gottlob which indicated negative views toward some students, the fact remains that Dr. Gottlob's CT Page 833 accomplishments were also well-known and appreciated by Dr. Beyard and other university officials. I conclude that either no formal decision had been made to renew the contract or despite some perceived problems there was no decision that it shouldn't be renewed. Then the gambling — confidentiality issue arose and the decision was made not to renew. Any negative comments to or observations about Dr. Gottlob were blown out of proportion in light of the stance the plaintiff took on the confidentiality issue and used to confirm those negative opinions which by themselves would not have served to lead Dr. Beyard to recommend non-renewal.
I can't even say and do not conclude that Dr. Beyard intentionally or knowingly misrepresented her feelings or tailored her testimony. But I cannot explain all the evidence in this case without concluding that in any event Dr. Gottlob's stance on the gambling — confidentiality issue was a substantial factor leading to the non-renewal of her contract.
Also in light of the above discussion I also conclude that under the Mt. Healthy case analysis the university could not establish that even apart from this speech issue they would not have renewed her contract.
However, in light of my ruling on whether First Amendment
protection applies to this speech in the first instance (public concern issue) and my ruling on the university's defense of interference with efficient operations, I will grant judgment to the defendant.